Elmer G. Biechler, Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Docket No. 93127.   Promulgated June 30, 1939.

---

*Joseph Bradford Coolidge, Esq.*, for the petitioner.
*C. E. Lowery, Esq.*, for the respondent.

### OPINION.

MELLOTT: The Commissioner determined a deficiency in petitioner's income tax for the year 1934 in the amount of $9,457.69. The questions presented are: (1) Whether the exchange by petitioner in 1930 of his class A and B stock in the Managers Securities Co. for class A stock in the General Motors Securities Co. was in pursuance of a plan of reorganization so that the latter stock took the basis of the Managers Securities Co. stock for the purpose of determining gain or loss, or whether he is entitled to use a "stepped-up" basis equivalent to its fair market value when acquired; (2) whether petitioner, having joined with the respondent for a number of years in treating the 1930 transaction as a reorganization, may now claim that it was not a reorganization in order to give the stock such "stepped-up" basis, or whether he is estopped from doing so; and (3) whether the surrender by petitioner in 1934 of certain shares of class A stock in the General Motors Securities Co. for common stock in the General Motors Corporation was in partial liquidation of the General Motors Securities Co., within the meaning of section 115 (c) of the Revenue Act of 1934, as determined by the respondent, or, as contended by petitioner, constituted a sale or exchange of a capital asset within the purview of section 117 of the same act.

The facts were stipulated. All of the basic facts in connection with the organization of Managers Securities Co. (hereinafter referred to as "Managers"), its plan of operation, its purchase of com-

mon stock of General Motors Co. and of common stock of General Motors Securities Co. (hereinafter referred to as "Motors Securities"), the "Agreement of Reorganization" entered into in December 1930 between Managers and Motors Securities, the steps leading up to the surrender by petitioner and others of their class A and B common stock in Managers and their acquisition of new class A stock in Motors Securities, are shown in *Chester A. Souther*, 39 B. T. A. 197, and need not be repeated. The additional facts, pertaining to the surrender by petitioner of his stock in Managers for Motors Securities class A stock, the subsequent surrender by him of the Motors Securities stock for General Motors stock, the treatment of the series of transactions by him, and his and the respondent's present contentions are substantially as follows:

In connection with the distribution in dissolution of Managers on December 29, 1930, petitioner received 45,090 shares of Motors Securities class A stock which on that date had a fair market value of $34.25 per share. Petitioner did not return as income in his Federal income tax return for the year 1930 any amount as profit realized by him on the conversion of his Managers class A and B stock in 1930 into Motors Securities class A stock, nor did the Commissioner, after examination, increase his income for said year by any amount with respect to any profit derived by him in that year as a result of the transaction.

In his income tax returns for 1931 and 1933 petitioner reported capital gains from the exchange by him of 13.082 and 8,500 shares of Motor Securities class A stock for a like number of shares of General Motors common stock, and paid taxes computed on a cost basis to him for Motors Securities class A stock of an aliquot portion of the cost of his Managers A and B stock.

On December 18, 1934, petitioner surrendered 1,250 of the Motors Securities class A shares, received in the exchange in 1930, for a like number of shares of General Motors common stock. He does not deny that this was a transaction in which gain or loss must be recognized, but contends that he is entitled to use a cost basis of not less than $34.25 per share for the Motors Securities stock. In his determination of the deficiency respondent used a cost basis of $1.8138192 per share, which substantially reflects the correct aliquot part of the cost to petitioner of the Managers stock, and included in his income, under section 115 of the Revenue Act of 1934, the entire amount of the gain computed on such basis.

Our present discussion will be limited largely to the additional argument advanced by counsel for the petitioner at the hearing of the instant proceeding and to the brief filed by the same counsel in connection with the "application for reconsideration" in the *Souther*

case. But first a brief resume of the most salient facts in connection with the exchange of the Manager's stock for class A stock of Motors Securities in 1930 will be given.

On December 29, 1930, Managers properties consisted of cash, notes of General Motors Acceptance Co. (the aggregate of the two being sufficient to pay its Federal income tax, which was its only liability), 290,310 shares of General Motors common stock and 148,509 shares of the common stock of Motors Securities. The sole asset of Motors Securities consisted of 7,500,000 shares of General Motors. One share of Motors Securities stock had a value equivalent to 28.4 plus shares of General Motors and the 148,509 shares of the common stock of Motors Securities owned by Managers would have liquidated for 4,218,750 shares of General Motors. On that date, pursuant to an "Agreement of Reorganization", Managers transferred to Motors Securities its General Motors stock and its shares of Motors Securities. Motors Securities amended its articles of incorporation to provide for the issue of 4,509,060 shares of class A stock with a par value of $1 per share and the right to $\frac{1}{100}$ of a vote. For the sole benefit of the class A stock a special asset account was set up, to which 4,509,060 (4,218,750 + 290,310) shares of General Motors were allocated. A class A surplus account was created, to which was to be credited all income and profits received in connection with the General Motors stock in the special asset account. The 4,509,060 shares of class A Motors Securities stock were delivered to Managers, and Managers distributed it among its stockholders, surrendered its corporate charter, and dissolved. Petitioner received 45,090 of the class A shares as above set out having a value of $34.25 per share. Although the Managers stock which he surrendered had a cost basis of only about $1.81 per share, no gain was reported by him or asserted by the Commissioner.

The questions in the instant proceeding are the same as those decided in the *Souther* case. Petitioner, like the petitioners in that case, contends that the acquisition of the class A Motors Securities stock was a transaction in which neither gain nor loss was to be recognized because of the provision of section 112 of the Revenue Act of 1928;[1] that he is entitled to a "stepped-up" basis for the stock

---

[1] SEC. 112. RECOGNITION OF GAIN OR LOSS.

\*     \*     \*     \*     \*     \*     \*

(i) *Definition of reorganization.*—As used in this section and sections 113 and 115— (1) The term "reorganization" means (A) a merger or consolidation (including the acquisition by one corporation of at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation, or substantially all the properties of another corporation), or (B) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor or its stockholders or both are in control of the corporation to which the assets are transferred, or (C) a recapitalization, or (D) a mere change in identity, form, or place of reorganization, however effected.

disposed of in the taxable year; that the gain upon the surrender of Motors Securities class A stock for General Motors stock should be recognized only to the extent prescribed by section 117 of the Revenue Act of 1934;[2] and that section 115 (c) of the Revenue Act of 1934,[3] is not applicable. We found the contentions to be unsound and upheld the deficiencies determined by the Commissioner.

It is urged that the Board erred in following its own decision in *H. B. Leary, Sr.*, 34 B. T. A. 1206, and the opinion of the Court of Appeals for the Fourth Circuit affirming it in *Helvering* v. *Leary*, 93 Fed. (2d) 826. In this connection it is pointed out that three Circuit Courts of Appeals—the Second, Ninth, and Third—have held that the transaction involved in what may, for convenience, be designated the "Food Industries" cases, was a reorganization within subdivision (B) of section 112 (i) (1), *supra*, rather than within subdivision (A). Two of the cases were discussed in the *Souther* opinion—*Helvering* v. *Schoellkopf*, 100 Fed. (2d) 415, and *Commissioner* v. *Kolb*, 100 Fed. (2d) 920. The third one—*Commissioner* v. *Food Industries*, 101 Fed. (2d) 748, promulgated February 9, 1939, by the Court of Appeals for the Third Circuit—has been decided since our decision in the *Souther* case. See also *Commissioner* v. *Whitaker*, 101 Fed. (2d) 640. The basic facts in the *Food Industries* case are as follows:

In 1931 the outstanding capital stock of a New York company consisted of 90,775 shares of no par value $8 cumulative preferred and 429,719 shares of no par value common stock, both classes of stock having equal voting privileges. In round figures, the ratio

---

[2] SEC. 117. CAPITAL GAINS AND LOSSES. ·

(a) GENERAL RULE.—In the case of a taxpayer, other than a corporation, only the following percentages of the gain or loss recognized upon the sale or exchange of a capital asset shall be taken into account in computing net income:

100 per centum if the capital asset has been held for not more than 1 year;

80 per centum if the capital asset has been held for more than 1 year but not for more than 2 years; ·

60 per centum if the capital asset has been held for more than 2 years but not for more than 5 years;

40 per centum if the capital asset has been held for more than 5 years but not for more than 10 years;

30 per centum if the capital asset has been held for more than 10 years.

\* \* \* \* \* \* \*

(c) DETERMINATION OF PERIOD FOR WHICH HELD.—For the purpose of subsection (a)—

(1) In determining the period for which the taxpayer has held property received on an exchange there shall be included the period for which he held the property exchanged, if under the provisions of section 113, the property received has, for the purpose of determining gain or loss from a sale or exchange, the same basis in whole or in part in his hands as the property exchanged.

[3] SEC. 115. DISTRIBUTIONS BY CORPORATIONS.

\* \* \* \* \* \* \*

(c) DISTRIBUTIONS IN LIQUIDATION.—Amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock, and amounts distributed in partial liquidation of a corporation shall be treated as in part or full payment in exchange for the stock. \* \* \* Despite the provisions of section 117 (a), 100 per centum of the gain so recognized shall be taken into account in computing net income. \* \* \*

of voting power of the common to the preferred was 429 to 90. A Maryland corporation owned all but 313 shares of the New York company's common stock, but owned none of its preferred. The only other property of the Maryland corporation consisted of miscellaneous assets valued at about $61,000. It was decided to dissolve the Maryland corporation, and a plan was entered into by the Maryland corporation and the New York company, which, in so far as here material, was as follows: Both corporations agreed to reorganize their corporate structures by reclassifying their common stock so that the outstanding shares of the Maryland corporation would approximately equal, on a share for share basis, its holding of the common stock of the New York company. The New York company changed its outstanding 429,719 shares of no par common stock into 1,594,798.93 shares of $5 par value common stock, of which the Maryland corporation, as holder of shares of common stock of the New York Company, was entitled to receive 1,593,637.31. The result of this capital reorganization of the New York company was to increase the ratio of voting power of the common over the preferred from 429 to 90, to 3,747 to 90. The Maryland corporation amended its charter to reclassify its total of 3,472,360 shares of outstanding common stock into 1,593,640.80 shares of common. The Maryland corporation then transferred its shares of the common stock of the New York company, and miscellaneous assets having a value of about $61,000, to the latter corporation and received 1,593,637.31 shares of its (the latter company's) common stock. The stockholders of the Maryland corporation surrendered their stock in that corporation and received stock of the New York company. The Maryland corporation was then dissolved.

At the time of our decision in the *Souther* case, all three of the Circuit Courts, which had passed upon the question, had held that there was a nontaxable reorganization in the Food Industries transaction outlined above. The Second and Ninth had held that it came within subdivision (B) of section 112 (i) (1), *supra*, and a similar holding has now been made by the Third and First. The Fourth, as pointed out in the *Souther* case, affirmed our conclusion that it came within subdivision (A). In reaching this conclusion in *Helvering* v. *Leary, supra*, it said:

The New York Company undoubtedly acquired substantially all the properties of the Maryland Corporation and immediately reissued its own stock in exchange therefor. The interest of the stockholders of the Maryland Corporation in the business owned by the New York Company and the Maryland Corporation, the holding company, remained, with but slight change, in the property owned by the New York Company after the plan was carried out. It seems clear that such a situation results, in its legal effect, in a reorganization within not only the letter but the spirit of the taxing statute and brings the

transaction within that class which Congress plainly intended not to tax until the stockholder finally disposed of his stock and his profit was definitely ascertainable. There was no change in the taxpayer's position with respect to the ownership of the property but merely a change in the form of the stock certificates held by him.

In *Commissioner* v. *Kolb, supra*, the Ninth Circuit, holding that our finding to the effect that the Maryland corporation had transferred "substantially all of its assets" was too broad, said: "The evidence does not show that 'substantially all' the assets of the Maryland Corporation were transferred to the New York Company, for the New York common was surrendered for the issue instanter of a reclassified substitute. There was hence no reorganization under 112 (i) (1) (A) * * *." This, and language somewhat similar used by the other courts, is relied upon by petitioner as supporting his contention that there was no subdivision (A) reorganization under the facts presently stipulated.

Was there in December of 1930 an acquisition by Motors Securities of substantially all the properties of *another* corporation (Managers)? If so, then petitioner, and the other stockholders of Managers who were before us in the *Souther* case, correctly refrained from reporting any taxable gain in connection with the exchange made by them in 1930 and are not entitled to use any "stepped-up" basis upon the disposition in the taxable years of the stock received in such exchange.

Under the "Agreement of Reorganization", the shares of General Motors common and of Motors Securities common owned by Managers were to be and were transferred to Motors Securities in exchange for a new class A stock of Motors Securities. Assets, consisting of cash and notes having a value of approximately $1,000,000, were retained by Managers and used to liquidate its liabilities. The class A stock which was received by Managers in this exchange differed materially from the stock which was given up in the exchange. The General Motors stock which was turned in by Managers, together with 30 percent of the General Motors stock owned by Motors Securities, was placed in a special asset account. To this account there was to be credited only the "income, rights and profits received in connection" with such assets, and the "increases thereof or substitutes therefor as a result of stock dividend, exchange, or otherwise." The Motors Securities class A stock issued to Managers and distributed to its stockholders had certain attributes not possessed by Motors Securities common stock, including the right of each holder, "before any distribution be made to stockholders of any other class, to receive his pro rata share of the assets allocated thereto, viz., one such present share of General Motors Corporation * * *."

If Managers, under the "Agreement of Reorganization", had transferred to Motors Securities *all* of its properties, including the cash and notes, and, after receiving in exchange therefor stock of Motors Securities, had been dissolved, there would have been a true merger and hence a reorganization, and a consideration of the parenthetical clause of subdivision (A) would not be necessary. However, it did not transfer the cash and notes. The parenthetical clause of subdivision (A) was intended to embrace transactions partaking "of the nature of a merger or consolidation but [which are] beyond the ordinary and commonly accepted meaning of these words—so as to embrace circumstances difficult to delimit but which in strictness cannot be designated as either merger or consolidation." *Pinellas Ice & Cold Storage Co.* v. *Commissioner*, 287 U. S. 462; *Helvering* v. *Minnesota Tea Co.*, 296 U. S. 378. Examining the transaction in the light of these cases, we are of the opinion that it partook "of the nature of a merger or consolidation." The cash and notes retained by Managers amounted to approximately 2 per centum of its total assets. The retention of cash or quick assets for the purpose of paying the liabilities of the transferor corporation does not prevent the application of the parenthetical clause of subdivision (A). *Nelson Co.* v. *Helvering*, 296 U. S. 374; *Claude Neon Lights, Inc.*, 35 B. T. A. 424; *Milton Smith*, 34 B. T. A. 702; *Western Industries Co.* v. *Helvering*, 82 Fed. (2d) 461. The 98 per centum of the assets of Managers, consisting of General Motors common stock and Motors Securities common stock, were transferred to Motors Securities. These assets were merged with the assets of Motors Securities and Managers' corporate existence was terminated. The former stockholders of Managers, to whom the class A stock was distributed, still had merely an interest in a corporation whose principal asset consisted of stock in the General Motors Corporation. They thus carried out their intention, and merely brought their "stock interest one step closer to the prime asset, viz., General Motors common stock in the Treasury of General Motors Securities Company" and were afforded the "opportunity at any time for those so desiring to liquidate it into General Motors common stock." (Letter of president to stockholders of Managers dated December 13, 1930.) In other words, their interests as stockholders "remained in solution." (*C. A. Munroe*, 39 B. T. A. 685) and had not been precipitated from the corporate venture. In our opinion this is the type of transaction which Congress had in mind when it enacted the parenthetical clause of subdivision (A).

Petitioner's contention that this conclusion is erroneous seems to be bottomed on the assumption the transaction here involved is identical to that in the *Food Industries* cases. While the facts are quite

similar, there are nevertheless points of difference. In the *Food Industries* transaction all of the common stock of the issuing corporation was surrendered and new common stock, differing only in voting rights, was issued in exchange therefor. This, as pointed out by the Second Circuit in *Helvering* v. *Schoellkopf*, *supra*, made "the two issues * * * so much alike as to be substantially the same." In other words, there was a mere proliferation of the interest of the stockholders, substantially the same result that would have followed the issuance of a stock dividend. Here, however, the stock which was surrendered and the stock which was issued in exchange therefor were substantially different. There was not a mere acquisition of stock and a transfer or reissue of similar stock. The stock surrendered was subject to all of the risks of the business of the issuing corporation. The stock issued represented an interest in a certain portion of the assets of the issuing corporation, the holders of such stock being entitled not only to all of the income and profits received upon such assets, but also to have them distributed in kind whenever they should so desire. It would be inaccurate and not in accord with the facts presently stipulated to say that "the two issues [here are] so much alike as to be substantially the same." Our reconsideration of the basic question has not convinced us that we erred in holding in the *Souther* case that the transaction in 1930 was a reorganization under subdivision (A), *supra*. We accordingly make the same holding here.

Petitioner's other major contention is that we erred in the *Souther* case in holding that subdivision (C), defining the term "reorganization" as a "recapitalization" was applicable. Section 112 (b) (3) of the Revenue Act of 1928 provides:

* * * No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.

Petitioner agrees that there was a recapitalization and hence a statutory reorganization within the meaning of subdivision (C). He contends, however, that it was merely a recapitalization of Motors Securities; that in a recapitalization only one corporation can be a party to it, namely, the corporation which is being recapitalized; and that under the stipulated facts Managers was not, and could not have been, such a party. He cites *Burns* v. *Commissioner*, 76 Fed. (2d) 937, in support of this contention.

In the cited case a cement company, in 1922, purchased for cash and notes all of the capital stock and bonds of a railway company. In 1925 the railway company converted its stock into no par value shares and issued $300,000 of par value bonds on its properties to re-

fund its former issue of bonds held by the cement company. The new bonds were delivered to the cement company upon its surrender of the old bonds. In 1926 the cement company distributed to its stockholders the bonds of the railway company. Petitioner's decedent, who was a stockholder of the cement company, received bonds of the railway company and did not include the value of these bonds in her income tax return for 1926, on the ground that the bonds were distributed as a result of a reorganization of the cement company in 1922 or in 1925 and did not constitute taxable income when received by her. The Court of Appeals for the Sixth Circuit held that there was a mere purchase for money of the stock and bonds of the railway company and no reorganization in 1922 within the meaning of the statute; that the decedent received the railway bonds because she was a stockholder of the cement company and not as a result of her ownership of any interest in the railway company; and that the changing of the par value of the stock of the railway company and the refunding of its bonds in 1925 was not a "recapitalization" or reorganization of the cement company. The precise question before us in the instant proceeding, however, was not decided.

In *Groman* v. *Commissioner*, 302 U. S. 82, the Supreme Court held that corporation Glidden, which had entered into a contract with the shareholders of corporation Indiana, obligating it to cause to be issued and delivered to them a stated number of its own prior preference shares of stock, a stated number of the preferred shares of stock of Ohio which it would organize, and some cash, all in exchange for stock which they owned in Indiana, was not a party to a reorganization any more than a banking corporation, broker or agent would have been under similar circumstances. While the question before the Court was not similar to the question before us, some of the language used by it in discussing section 112 (i) (2) of the Revenue Act of 1928—"The term 'a party to a reorganization' includes a corporation resulting from a reorganization and includes both corporations in the case of an acquisition by one corporation of at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation" is significant. The Court said: "* * * The section is not a definition but rather is intended to enlarge the connotation of the term 'a party to a reorganization' to embrace corporations whose relation to the transaction would not in common usage be so denominated or as to whose status doubt might otherwise arise. * * * Plainly, however, there may be corporate parties to reorganizations, within the meaning of the statute, other than those enumerated in section 112 (i) (2)."

We are of the opinion that Managers, though not within the class of corporations referred to in the latter portion of section 112 (i) (2), *supra*, was nevertheless a party to a reorganization. *Burns* v. *Commissioner, supra,* is not authority to the contrary. It will be noted that in that case there was no plan of reorganization involving the cement company. The cement company apparently took no part in the transaction whereby the par value of the stock of the railroad company was changed and its bonds refunded. "The railway company converted its stock into no par value shares and issued $300,000 of par value bonds on its properties to refund its former issue of bonds held by the cement company." In the instant proceeding, however, Managers was not only the instigator of the recapitalization of Motor Securities, but was also a party to the agreement of reorganization in which Motors Securities agreed that it would amend its charter creating the special class of stock for the purpose of issuing it to Managers in exchange for the 290,310 shares of General Motors common stock and 148,509 shares of Motors Securities common stock held by it. The agreement specifically provided that its execution was subject to approval by the stockholders of Managers and Motors Securities and if such approval should not be given, the agreement was to become null and void. In other words, there could have been no recapitalization of Motors Securities without the consent of Managers, which owned 30 percent of its stock. In *John S. Woodard*, 30 B. T. A. 1216 (petition for review dismissed), this Board said, in dealing with the question of whether or not a certain corporation was a party to a reorganization resulting from a merger: "Each took a vital and essential part in the transaction without which there could have been no reorganization, and each was, therefore, a party to the reorganization, notwithstanding only one of the corporations was reorganized." This language aptly describes the situation here involved. Managers was an essential and necessary party to the plan of reorganization, and without its participation the recapitalization of Motors Securities would not have occurred. It was, therefore, a party to the reorganization.

Recapitulating, we are still of the opinion that the 1930 transaction constituted an exchange of stock pursuant to a plan of reorganization and that the petitioner and the Commissioner correctly considered it to be such at that time and during subsequent years. It, in our opinion, was within the letter and spirit of the reorganization provisions of the statute. As pointed out in *Charles A. Dana*, 36 B. T. A. 97; affd., 103 Fed. (2d) 359, the purpose of Congress in enacting these provisions "* * * was to facilitate readjustments of corporate businesses by permitting the postponement of gain or loss on exchanges made in pursuance thereof where the transferor

retained a continuing interest in the reorganized corporation or corporations." Petitioner retained such continuing interest until he surrendered his Motors Securities class A stock for stock of General Motors. He then realized gain or loss measured by the difference between the cost of his Managers stock and the value of the General Motors stock so acquired by him.

Whether the surrender by petitioner during the taxable year of 1,250 shares of class A stock in Motors Securities for common stock in the General Motors Corporation was in partial liquidation of Motors Securities within the meaning of section 115 (c) of the Revenue Act of 1934, or constituted a sale or exchange of a capital asset within the purview of section 117 of the same act, need not be discussed in this opinion. We are content to adopt the conclusion reached on this issue in the *Souther* case without any repetition or elaboration of the discussion therein contained.

*Judgment will be entered for the respondent.*