American Central Manufacturing Corporation v. Commissioner.
American Cent. Mfg. Corp. v. Commissioner
Docket No. 16821.
United States Tax Court
1949 Tax Ct. Memo LEXIS 211; 8 T.C.M. (CCH) 368; T.C.M. (RIA) 49091; April 22, 1949
John W. Hughes, Esq., and John E. Hughes, Esq., 105 W. Adams St., Chicago, Ill., for the petitioner. Lester M. Ponder, Esq., for the respondent. KERN
Memorandum Findings of Fact and Opinion KERN, Judge: Respondent determined deficiencies in income taxes and excess profits taxes for the taxable years ended November 30, 1941, 1942, and 1943, as follows: Year Ended
Excess Profits
Nov. 30
Income Tax
Tax
1941
$ 41,566.80
$ 29,732.67
1942
116,319.27
102,417.64
1943
169,197.03
Petitioner's motion for severance of issues *212 having been granted, the question presented to us at this time is whether petitioner acquired the assets of its predecessor as a result of a reorganization as defined in section 112 (g) of the Internal Revenue Code. The disposition of this issue will establish a legal factor necessary in determining petitioner's basis for the acquired properties. All of the facts upon the issue presented have been stipulated and are hereby found accordingly. Only a summary of these facts, including so much as is necessary to understand the problem, will be given. [The Facts) Petitioner is an Indiana corporation, organized on May 13, 1940, for the purpose of acquiring assets and assuming the liabilities of the Auburn Automobile Co., hereinafter sometimes referred to as Auburn, pursuant to a plan of reorganization of Auburn under section 77 (B) of the National Bankruptcy Act. Petitioner was first known as Auburn Central Manufacturing Corporation. In 1942 its name was changed to its present one. Auburn was incorporated under the laws of Indiana in 1919, for the purpose of manufacturing passenger automobiles. Motors for these vehicles were manufactured by its subsidiary, *213 the Lycoming Manufacturing Co., hereinafter sometimes referred to as Lycoming. In December 1937 both Auburn and Lycoming filed petitions in the United States District Court for the Northern District of Indiana, for reorganization proceedings under section 77 (B) of the Bankruptcy Act. In its petition, Auburn recited that although it had then met its current obligations to merchandise creditors and employees, it did not have sufficient funds to meet payments on its outstanding debentures, and on its liability as guarantor of its subsidiary's preferred stock, nor did it have any means of borrowing or otherwise procuring the necessary funds to discharge these obligations. It expressed a desire of effecting a plan of reorganization under and pursuant to the provisions of the Bankruptcy Act. Immediately prior to the filing of the petition, Auburn had outstanding $2,266,755 of 4 3/4% convertible debentures. Of this amount, $1,526,912 was owned by Aviation and Transportation Corporation, which prior to December 1, 1939, was known as Cord Corporation, and will hereinafter be referred to as Cord. Auburn also h1d outstanding 227,432 shares of capital stock, of which stock 65,124 shares were *214 owned by Cord. Auburn also was contingently liable on the 8% preferred stock of Lycoming. At the time of filing the petition in bankruptcy that liability had become definite to the extent of $3,456 for dividends and $50,000 for a sinking fund payment. The plan of reorganization of Lycoming was approved on October 31, 1939. The plan provided for the transfer by Lycoming of all of its assets except a small amount of cash to the Aviation Corporation, hereinafter sometimes referred to as Aviation, in exchange for 206,000 shares of the common stock of the latter. Of this stock of Aviation, Auburn thereupon received 110,163 shares. Prior to April 20, 1940, 33,600 shares were sold for cash, leaving a balance of 76,563 shares held by Auburn on that date. On November 30, 1939, a stipulation between the various parties concerned with Auburn's reorganization was filed with the District Court. It was therein agreed that Auburn's proposed plan of reorganization theretofore filed on July 28, 1939, be amended and augmented as a result of Auburn's acquisition of the sizable block of Aviation stock. It was therein provided, inter alia, that Cord, which held Auburn's debentures in the approximate *215 principal amount of $1,500,000, would subordinate $500,000 principal amount thereof. All other debenture holders, the holders of the Lycoming guaranteed preferred stock, other than Cord and Lycoming, and merchandise creditors would receive shares of Aviation stock at $7.50 per share for 20% of the principal and interest of such debentures and of such other claims as were allowed by the Special Master. The holders of the guaranteed Lycoming stock, the publicly-owned Auburn debenture holders, and the general unsecured merchandise creditors would be entitled to receive for 40% of the allowed amount of such claims or debentures par value preferred stock of Auburn as reorganized, and such debenture holders and creditors would be entitled to receive for the remaining 40% common stock of Auburn as reorganized at the book value thereof, as adjusted. It was also stipulated that in respect to Cord's unsubordinated debentures, Cord would receive the 20% distribution of Aviation stock and the 40% distribution of preferred stock, as was provided for the publicly-held debentures, together with common stock of Auburn, for the remaining 40% of such claim, the common stock, however, to be delivered *216 to Cord at the rate of $10 per share instead of at the book value of approximately $5 per share. With reference to the subordinated debentures, Cord was to receive, in lieu of any other distribution, only common stock of Auburn at the rate of $10 per share for such stock. It was further stipulated, as follows: "The holders of the present common stock of Auburn Automobile Company shall be entitled to receive in the debtor company as reorganized, new common stock at the rate of one share of new common stock for each 10 shares of presently issued and outstanding common stock, the values of and equities for which have been supplied by the aforesaid subordination by Aviation and Transportation Corporation and by the aforesaid agreement by Aviation and Transportation Company to receive the common stock allocable to it at the rate of $10.00 per share instead of at the book value thereof. * * *
"In consideration of the agreements herein, the debtor as reorganized hereby releases and discharges Aviation and Transportation Company, its subsidiary and affiliated companies and their past and present officers and directors from any claim or demand of any kind or character whatsoever, *217 which the debtor may have had or may now have against any or all of them. Nothing contained herein however, shall in any wise affect the validity of or allowance of claims filed in the reorganization proceedings of the Auburn Automobile Company the debtor, and the Lycoming Manufacturing Company as subsidiary debtor, or the dispositions thereof according to the terms of existing or proposed plans or reorganization." In the original plan of reorganization of Auburn, it was provided that such claims should not be released. These claims existed against Cord and certain of its officers, who also held a controlling interest in Auburn, as a result of representations made by them in order to stimulate public interest in the sale of Auburn's stock and debentures. These agreements between the various parties concerned were then embodied in an amended plan of reorganization dated December 15, 1939, which was confirmed by the District Court on April 20, 1940. Under the plan a new corporation, petitioner herein, was to be formed with both common and preferred stock, both of which were to have voting rights, and it was to acquire Auburn's assets and assume its liabilities. The outstanding claims *218 and interests to be dealt with under the plan were detailed: (a) Taxes and other preferred
claims as allowed by the Special
Master
$ 14,850.00
(b) Three year 4 3/4% convertible de-
bentures due January 1, 1939,
p.a. $2,266,775 with accrued in-
terest thereon, including inter-
est upon unpaid installments of
interest, but allowed only to De-
cember 11, 1937
$2,314,626.62
(c) Accounts payable as allowed by
the Special Master
$ 157,000.00
(d) Claims in favor of holders of
preferred stock of Lycoming
Manufacturing Company pursu-
ant to guarantee of Auburn
Automobile Company
$ 172,800.00
(e) 227,425 shares of common stock,
no par.
(f) Fractional dividends scrip cer-
tificates outstanding for 811.66
common no par shares. The method of treatment of these claims and interests was outlined in the plan. Provision was made for the payment in full of taxes, preferred claims, and general claims of less than $100. As to all other claims, the specified securities of petitioner and the Aviation stock, held by Auburn, were to become available to the holders of these claims. These securities were enumerated in the plan, as follows: "1. Common stock of The *219 Aviation Corporation. "2. $50 par value 4% convertible preferred stock of the Company as reorganized (new issue). "3. Common stock no par value of the Company as reorganized (new issue) (Book value $5.00 per share.) "Common stock of The Aviation Corporation will be distributed in lieu of cash on the basis of $7.50 per share for 20% of such claim and interest as allowed, except for the subordinated debentures of Aviation and Transportation Corporation (p.s. $500,000 plus accrued interest of $10,555). " $50 par value 4% convertible preferred stock of the Company will be distributed on the basis of $50 per share for 40% of such claim and interest as allowed, except for the subordinated debentures of Aviation and Transportation Corporation. "Common stock of the Company will be distributed on the basis of book value thereof for the remaining 40% of such claim and interest as allowed, except to the Aviation and Transportation Corporation, which is to receive all shares of common stock no par value, to which it is entitled, on the basis of $10 per share." In summary, the securities to be issued for the outstanding claims were estimated to be as follows: Securities of Petitioner to be issued
Common
4% Cumulative
Common Stock
Capital Stock
Preferred
No par
of Aviation
Convertible
Value
Three Year 4 3/4% Convertible debentures
48,108
14,433
153,437
Unsecured General Creditors
4,054
1,216
12,160
Stock now outstanding
22,742
Holders of Lycoming guaranteed Preferred stock
4,608
1,382
13,824
56,770
17,031
202,163
*220 Attached to the amended plan of reorganization was a pro forma balance sheet of Auburn as of October 31, 1939, which is as follows: "AUBURN REORGANIZATION "Pro Forma Balance Sheet - October 31, 1939 "Assuming - "(1) 110,153 shares of The Aviation Corporation stock will be received in liquidation of Lycoming Manufacturing Company, and after reserving 13,334 shares for combined reorganization expense of Auburn and Lycoming, and after 56,770 shares are distributed to certain creditors as set forth in the reorganization plan, 40,049 shares will remain with Auburn. This stock is valued at $7.50 per share on the balance sheet. "(2) Effect has been given to the liquidation of Auburn Automobile Sales Corporation. "(3) Deferred charges written off books. "(4) Plant assets written down to $1,005,440. "(5) Settlement with creditors, debenture holders and stockholders as per reorganization plan dated December 15, 1939." ASSETS
Cash
$ 163,578
Notes and accounts, less reserve
146,475
Inventories, less reserve
324,432
40,049 shares of The Aviation Corporation stock at upset value
of $7.50 per share
300,367
Total Current Assets
$ 934,852
Other receivables, etc
22,219
Prepaid insurance, taxes, royalties
15,496
Plant assets
1,005,440
$1,978.007
LIABILITIES AND CAPITAL
Accounts payable and accrued expenses
115,642
Capital stock -
Preferred - 4% convertible, cumulative after January 1, 1942 -
50 par value -
Issued
17,031 shares
851,550
Common-No par value -
Issued
202,163 shares
1,010.815
$1,978.007
*221 (Book value $5.00 per share) On May 20, 1940, petitioner and Auburn entered into an agreement providing, in part, as follows: "1. Subject to and pursuant to the terms of this agreement AUBURN agrees at the closing date provided hereunder, to transfer and assign to CENTRAL [petitioner] all of its right, title and interest in and to all of its assets, business, good will, trade marks and trade names and other property of every name and description and wheresoever situated. "CENTRAL agrees in exchange and in consideration of the transfer and assignment of said assets that it will (a) to the extent required, deliver on the closing and thereafter from time to time, the shares of its authorized but presently unissued preferred stock of the par value of $50 per share validly issued and authorized, fully paid and non-assessable, and the shares of its authorized but presently unissued common stock of no par value, validly issued and authorized, fully paid and non-assessable, as may be required fully and completely to satisfy and discharge the obligations of AUBURN in respect thereto under the said PLAN, it being presently estimated that the number of such shares is 202,163 shares of *222 common stock of no par value and 17,031 shares of preferred stock of the par value of $50 per share; (b) to make such payments as may be necessary to comply with the terms of the Plan marked Exhibit A, and to satisfy the rights of claimants and other parties in interest thereunder, and to assume any and all other enforceable obligations of any kind, nature or description which AUBURN may now or hereafter be under pursuant to the terms of said Plan or the orders of the United States District Court for the Northern District of Indiana, and (c) insofar as consummation of said Plan may require, CENTRAL agrees to do and perform any and all other acts of any kind, nature or description which may be directed to be performed by the said United States District Court until the discharge of said proceedings of AUBURN by said Court, (d) to pay and discharge all liabilities of AUBURN incurred since December 11, 1937 existing at the time of the transfer then unpaid, as well as taxes and assessments whenever incurred disclosed or undisclosed, and (e) CENTRAL further agrees to assume and pay all obligations and all expenses incident to and connected with the execution, delivery and performance of *223 this agreement, at the time of the transfer then unpaid." As of June 13, 1940, Auburn's assets, except for about $172,000 worth of property having been previously disposed of in 1938, were transferred to petitioner, which thereupon assumed Auburn's liabilities. This transfer and the contract of May 20, 1940, were approved and confirmed by the District Court as pursuant to and in consummation of the plan of reorganization of Auburn. In the final report of Auburn to the District Court, there was included a general outline of the manner in which the cash, Aviation stock, and petitioner's stock were distributed: Common
Petitioner's
Petitioner's
stock of
preferred
common
Aviation
stock
stock
Cash
(Shares)
(Shares)
(Shares)
To Holders of: Taxes preferred claims and unsecured claims
of less than $100
$14,850.00
4 3/4% convertible debentures of Au-
burn
1,949.17
45,984
13,735
148,164
Unsecured general trade creditors hold-
ing claims in excess of $100
763.56
4,006
1,166
12,566
Preferred stock of Lycoming guaran-
teed by old company
127.50
4,591
1,370
13,948
Common stock of Auburn
1,640.00
16,994
Totals
$19,330.23
54,581
16,271
191,672
*224 As the transaction finally eventuated, 59,793 shares of Aviation's stock were distributed in accordance with the plan of reorganization. The remainder of such stock, 19,770 shares, was sold by petitioner during the year 1942. Petitioner acquired substantially all of Auburn's properties in 1940, pursuant to the 77 (B) reorganization of the latter. [Opinion] Whether this 77 (B) reorganization can qualify as a reorganization under section 112 (g) (1) (C) of the Code, [1] the subdivision strenuously urged by petitioner as being applicable, is the principal issue presented to us at this time. Under the facts that issue, stated more narrowly, is whether petitioner acquired substantially all of Auburn's properties solely for its voting stock. No question is raised by respondent as to the voting nature of petitioner's stock given for the acquired assets. Cf. I.T. 3896, C.B. 1948-1, page 72. Nor do we think that in this transaction, as it must be realistically viewed, petitioner gave anything other than voting stock for the properties it acquired. We are, of course, permitted under the Code to disregard the assumption of the liabilities, "in determining whether the exchange is solely *225 for voting stock." The actuality of the situation is that petitioner, as a final step in the reorganization of the business of Auburn, assumed Auburn's liabilities and acquired, solely for its own voting stock, all of Auburn's assets that remained after the distribution of slightly over 56,000 shares of Aviation stock to Auburn's creditors. All of this was carefully recited in the plan as finally confirmed by the District Court, and in the agreement between Auburn and petitioner, which *226 we believe represent what, in fact, occurred. The principal question that confronts us is whether the property thus acquired by petitioner was substantially all of the transferor's properties within the meaning of section 112 (g) (1) (C). Southland Ice Co., 5 T.C. 842. The answer to this question "depends upon the facts and circumstances in each case rather than upon any particular percentage * * * and must be resolved as an ultimate conclusion of fact." Peabody Hotel Co., 7 T.C. 600, 614. Among the elements of importance that are to be considered in arriving at the ultimate conclusion are the nature of the properties, retained by the transferor, the purpose of the retention, and the amount thereof. Milton Smith, et al., 34 B.T.A. 702; Elmer G. Biechler, 40 B.T.A. 184. [2] A quotation from the Milton Smith case is particularly pertinent: "In this case * * * assets having a book value, in round figures of $133,000 were transferred for stock * * *; assets worth $52,000 * * * were retained for the purpose of meeting liabilities of $46,000. *227 After discharging its liabilities - and this was done within the year - the outside figure of assets remaining with the petitioner would be $6,000, which is certainly not an excessive margin to allow for the collection of receivables with which to meet its liabilities. No assets were retained for the purpose of engaging in any business or for distribution to stockholders. In these circumstances, we are of the opinion that the assets * * * transferred * * * constituted 'substantially all' the assets of the [transferor] within the meaning of that statutory phrase * * *." Here, of the assets not transferred by Auburn, no portion consisted of any operating properties and no portion was retained by it for its own continued use. Rather, the stock that was not turned over to petitioner was distributed, and was required to be distributed, as part of the plan, in liquidation of a part of Auburn's liabilities. What was sought to be, and what apparently was, accomplished as a result of the 77 (B) reorganization, was the continuance of a going business by the virtual elimination of the stockholders' interest, a substantial reduction in debt by the payment of Aviation stock, an asset not needed *228 in the business, and the conversion of the remaining debt into stock of a new corporation continuing the business of the old corporation with substantially all the assets of the latter. We believe that this is one of the types of "Insolvency reorganizations * * * within the family of financial readjustments embraced * * * in this particular statute." Helvering v. Alabama Asphaltic Limestone Co., 315 U.S. 179, 184. The proportionate amount of Aviation stock retained by Auburn, and used to liquidate part of its debt, was not so large as to cast doubt on the true nature of the transaction before us. Cf. Southland Ice Co., supra.We conclude that petitioner acquired substantially all of the properties of Auburn in 1940 by virtue of the 77 (B) reorganization proceeding. Milton Smith et al. supra; Commissioner v. First National Bank of Altoona et al., Trustees, (CCA-3) 104 Fed. (2d) 865; Western Industries Co. v. Helvering (C.A.D.) 82 Fed. (2d) 461. *229 We see no merit to respondent's contention that there should be included in the assets not transferred to petitioner that property of the value of slightly over $172,000, sold by Auburn for cash in 1938, long before the filing and confirmation of the plan of reorganization, which was ultimately effected. The sale was made while Auburn was under the jurisdiction of the District Court, and was made pursuant to authority granted by the District Court. The properties sold were of no particular value to Auburn in its business, and their retention was burdensome and expensive. The sale resulted merely in the change in the form of assets from property to cash, and was made for the apparent purpose of protecting and preserving Auburn's interests, and not of decreasing them. We also can not subscribe to respondent's argument that petitioner gave consideration other than voting stock for the acquired properties. The argument is that the Aviation stock was distributed by petitioner to Auburn's creditors as a step in the acquisition of Auburn's property, and that certain claims against Cord and its officers were relinquished by petitioner in return for the property acquired. As to the first *230 contention, it is our opinion that the shares of Aviation stock distributed to the creditors were, in fact, never acquired by petitioner, cf. Westfir Lumber Co., 7 T.C. 1014, but were, in substance, retained and used by Auburn to discharge its liabilities. Southland Ice Co., supra.As to the relinquishment of the claims, they were never claims of petitioner. They were claims of Auburn and Auburn's stockholders. It was only by the relinquishment of such claims by the stockholders of Auburn, and the subordination by Cord of some of the debentures it held, that the old shareholders were able to receive any of petitioner's stock. It is our opinion that no consideration other than voting stock flowed from petitioner. We conclude that there existed here the necessary continuity of interest upon which to find that there was a reorganization within the purview of section 112 (g) (1) (C) of the Code. The parties are directed to file computations under Rule 50 or to otherwise move in respect of this case, on or before June 1, 1949. Footnotes
1. SEC. 112 (g) Definition of Reorganization. - As used in this section (other than subsection (b) (10) and subsection (1) and in section 113 other than subsection (a) (22)). (1) The term "reorganization" means * * * (C) the acquisition by one corporation, in exchange solely for all or a part of its voting stock, of substantially all the properties of another corporation, but in determining whether the exchange is solely for voting stock the assumption by the acquiring corporation of a liability of the other, or the fact that property acquired is subject to a liability, shall be disregarded, * * *.↩
2. "* * * the nature of the properties transferred and the properties retained should be considered in determining whether there is a transfer of 'substantially all.' If a corporation transfers all of its plant, inventories, good will, etc., and retains notes, accounts receivable, cash, etc., 'substantially all' might properly be placed at a lower percentage than if the corporation retained part of its plant or business." I Montgomery's Federal Taxes, Corporations and Partnerships 1948-49, pp. 243-244.↩