Chicago Trust Company, Appellee, v. 12-14 West Washington Street Building Corporation et al., Appellees. Stanley Field et al., Appellants.

Gen. No. 37,405.

118

Opinion filed December 19, 1934.

WILSON & McILVAINE, of Chicago, for appellants.

HOWE, RADEMACHER, KREAMER & STALLING, of Chicago, for appellee Chicago Trust Co.

J. LESTER WILLIAMS and MARVIN WALLACH, both of Chicago, for appellee Bondholders Protective Committee.

MR. JUSTICE WILSON delivered the opinion of the court.

The Chicago Trust Company, as trustee, filed its bill to foreclose a trust deed on certain premises known as 12-14 West Washington street. The trust

deed was given to secure an issue of $375,000 worth of bonds on a leasehold of the premises in question. The lease was executed February 13, 1920 and was for a term of 99 'years. May 6, 1930, an order was entered in the foreclosure proceedings appointing one Arthur Dean receiver, with directions to apply the income from the building to the payment of the expenses and charges of operating and maintaining the mortgaged property, including taxes, rents, etc.

The premises at the time of the execution of the lease were improved with a 10-story building of permanent construction containing a store on the ground floor and offices above. The leasehold rental was $25,000 a year, payable in quarterly instalments of $6,250. No rent was due at the time the foreclosure proceedings were instituted and the first default after the receivership was for the quarter beginning September 1, 1932, and none was thereafter paid. The general taxes also became in default and on October 31, 1932, the owners, Stanley Field, individually, and Stanley Field, James Simpson and the Northern Trust Company, as trustees under the last will of Joseph N. Field, deceased, gave notice of default at the expiration of the 60-day period, and the default not having been made good, declared the term ended.

April 6, 1933, the owners filed their intervening petition, asking for possession of the premises and an order was entered in the cause December 20, 1933, granting the prayer of the intervenors and giving them possession. At the same time the court entered a supplemental decree finding that the sum of $100,000, paid by the lessees at the time of the execution of the lease, was, in fact, a cash deposit in trust to secure the payment of the rent, and that on account of the default by the lessees, the owners should account for said deposit. The supplemental decree then found that the default in rent and taxes amounted to $73,891.01, and that the balance of the $100,000 in the

hands of the intervenors amounting to $26,108.99, should be paid by the owners to the complainant for the benefit of the bondholders. The decree also provided that the receiver should pay to complainant for the benefit of the bondholders, all of the rents collected by him from the premises on or before April 6, 1933 (the date upon which the lessors intervened), after deducting all the costs, charges and expenses of operation and the pro rata part of the fees of the receiver and his solicitor, the intervenors to receive rents collected after April 6, 1933, but after the deduction of costs of operation and a pro rata part of the fees. The receiver's last account which was for the period from November 1, 1932 to September 30, 1933, showed a previous balance of $6,376.78. The receipts for this period were for $41,159.69. Disbursements for the period (including no ground rent) were $34,113.23. The balance (including $4,158.81 in closed bank) was $13,423.24. Rents accrued and uncollected, $39,921.47, of which $19,921.47, was estimated as uncollectible.

Intervenors assign as error the action of the chancellor in construing the original payment of $100,000 at the time the lease was procured as a trust fund to secure the payment of the rent and urge that the lease is not open to construction but clearly indicates that this amount was paid for the building for the purpose of obtaining the lease and that the lease was to be construed as though the tenant had, himself, erected the building upon the premises. The intervenors further contend that they are entitled to the full amount in the hands of the receiver because there was not sufficient in his hands to pay intervenors all of the defaulted rent and taxes and that nothing should be paid to the owners of the leasehold or the bondholders while the lease was not kept alive. This last contention is based upon the theory that the law provides that the lessee shall pay the rent to keep the lease

alive, as well as the taxes, and that, moreover, the order appointing the receiver directed him to pay the rents and taxes and that these are part of the operating expense.

Cross error is assigned on behalf of the bondholders' protective committee on the ground that the taxes for 1931 and 1932 should be disallowed as a charge against the $100,000 deposit. This, upon the ground that they were neither delinquent nor ripe for a protest and should not be estimated. To this assignment of cross error intervenors reply by stating that the lease provides that these taxes became due and payable by the lessees when levied or assessed and that these taxes had already been levied prior to the date of the decree. Furthermore, that the original decree provided for the payment of these taxes and it was the duty of the receiver to have followed the instructions in the decree.

The principal question before us is the action of the chancellor in finding the $100,000 payment a deposit, as security for the rents. The only other question is as to whether or not the balance in the hands of the receiver should go to the intervenor because of unpaid taxes and defaulted rent.

Article IV of the lease relates to the sale of the building and involves the sum of $100,000 paid upon its execution. In view of the importance of this particular clause we set it out in full:

"In consideration of the sum of one hundred thousand dollars ($100,000), the receipt whereof is hereby acknowledged, and of the covenants and agreements of the lessees herein, said lessors hereby sell and assign to the said lessees the buildings and improvements now situated on said demised premises, subject, however, to the covenants herein contained on the part of said lessees to be kept, observed and performed, the interests and rights of the lessees in said buildings and improvements to be the same as though said

buildings and improvements had been placed on said demised premises by said lessees subsequent to the execution of this lease.

"It is understood and agreed that said premises are demised subject to all existing leases thereon, and said lessees hereby expressly covenant and agree to be bound by and to fully observe and perform all the conditions, undertakings and agreements in said existing leases contained which extend to and bind the lessors therein."

Article XX of said lease should also be read and considered in connection with Article IV. Article XX reads as follows:

"The said lessees covenant and agree to and with the said lessors that upon the termination of this lease by forfeiture or lapse of time the said lessees will at once surrender and deliver up to the lessors the above described premises, together with all the improvements thereon, and that all buildings, fixtures and improvements then standing upon the said demised premises, shall belong to the said lessors, and that no compensation shall be allowed or paid therefor."

The language of Article IV of the lease is not ambiguous. It specifically provides that the building has been sold to the lessees for the sum of $100,000. In order that there might be no misunderstanding of this particular clause it moreover, contains the additional provision that the rights of the lessees in the building were to be the same as if said building had been erected on the premises by the lessees subsequent to the execution of the lease. This particular clause deals definitely with the subject of the building and none other and should be controlling in so far as the relationship of the lessors and the lessees is concerned with regard to this particular subject. While the lease contains certain provisions defining the relationship of the lessors and lessees in the event of the

destruction of the premises, the maintaining of insurance and other provisions, we find none which would indicate that the $100,000 was paid as a trust fund for the benefit of the lessees. In the case of *Wolf v. DeWolf & Co.*, 53 F. (2d) 999, which was a suit in which the income from this identical lease was concerned, in referring to this lease it is stated that the owners granted a 99-year leasehold to William H. and Henry K. Browning and "at the same time sold to said Brownings the building situated thereon." While the construction of this lease was not necessarily involved in that case, it nevertheless indicated the natural view that a court would take of this particular section of Article IV of the lease upon examination.

A careful consideration of the lease in question seems to bear out the proposition that the lessors attempted to clearly indicate that the $100,000 was paid as a consideration for the giving of the lease and that it was attempted to expressly define this position by calling it a sale of the building. The further provision in the lease, namely, that the building was to bear the same relation to the real estate as if it had been built subsequent to the execution of the lease indicates the intention of the parties to have this building attached to the realty in such a manner as to belong to the lessors in case of default. The law does not favor forfeitures, but neither will it rewrite the contract of the parties.

At the common law by the weight of authority, a tenant lost his right to remove fixtures from the real estate if by any act or omission he had forfeited his interest under the lease. Tiffany on Real Property, vol. 1, pp. 932 and 938. This rule was clearly expressed in Article IV of the lease as well as Article XX hereinbefore set forth. Only under a strained construction could it be possible in our opinion to place

an interpretation upon the lease finding the payment of $100,000 to be security for the lessees in the event of default. We believe the chancellor was in error in attempting to do this by the supplemental decree. This fund belonged to the intervenors, and the lessees, or those holding under them, are not entitled to any part of this fund.

It was stipulated by and between the parties that the 1929 general taxes were for $20,460.32, of which the receiver paid $16,278.13. It was also stipulated that the general taxes for 1930 were $22,423.18, of which the receiver paid $4,348.93. These figures indicate that a considerable amount of unpaid taxes existed which were a lien on the premises. The original decree appointing a receiver provided that he should pay these taxes out of the funds coming into his hands. Moreover, the lease itself provided that the lessees should pay these taxes and this proviso was obligatory upon the bondholders as well as any others operating under the lease. The payment of taxes, moreover, is an operating expense. *Union Trust Co. v. Great Eastern Lumber Co.*, 248 Fed. 46. If the receiver did not pay, the owners would be compelled to. The lessees could not claim a fund in the hands of a receiver so long as any part of the rent or taxes remained unpaid and this applies in our opinion to taxes and rent due prior to the default as well as after. The fund in the hands of the receiver became impressed with an obligation to satisfy these claims of the owners before any distribution could be made to the lessees or those claiming under them. Rent is something which a tenant renders out of the profits of the land which he enjoys. Equitably a lessee ought not to take profits out of his leasehold without a due discharge of the rents. *Otis v. Conway*, 114 N. Y. 13, 20 N. E. 628.

We agree with the chancellor that the actual costs of administration by the receiver should first be deducted from the fund in his hands. This would include attorneys' fees, receiver's fees, court costs and such other incidental costs of administration. After the payment of these items of administration the balance in the hands of the receiver should be applied in satisfaction of taxes and rentals due, the owners of the property and the balance, if any remaining, distributed among the bondholders. These payments to the owners of rentals and taxes apply as well to the amount due prior to the filing of the intervening petition as well as after.

We are not impressed with the assignment of cross errors of the bondholders. The court found the amount of the taxes for 1931 and 1932 and credited the amount of these taxes to the intervenors. It is insisted under the assignment of cross errors that it does not appear in the record that these taxes had accrued. We gather from the record, however, that they had been levied against the property and therefore became a lien. The fact that there might have been a right to protest did not prevent the taxes levied from remaining a lien upon the premises in question. Neither are we impressed with the argument that the lessor did not ask for rents prior to January 20, 1933. The original decree provided that such rents should be paid and the owners of the property had a right to rely upon the terms of that decree. It was not until a default in the payments that they filed their intervening petition and took possession of the property. The obligation on the part of the receiver, to pay these rents to the owner under the terms of the lease and under the decree of the court, still existed.

For the reasons expressed in this opinion, the supplemental decree of the superior court entered December 20, 1933, is reversed and the cause remanded to

the superior court with directions to enter a proper decree in conformity with the views expressed in this opinion.

*Judgment reversed and cause remanded with directions.*

HEBEL, P. J., and HALL, J., concur.