CLARIDGE APARTMENTS COMPANY, AN ILLINOIS CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 106868.   Promulgated December 4, 1942.

*Walter Hamilton, Esq.*, for the petitioner.
*David Altman, Esq.*, and *George E. Gibson, Esq.*, for the respondent.

OPINION.

OPPER, *Judge:* The first point in controversy is the correct basis for depreciation on petitioner's property, the problem being whether that is cost to petitioner or its predecessor's adjusted basis. The primary question is whether under Revenue Act of 1934, section 112, and particularly under the recent decisions of the Supreme Court[1] interpreting it, there was a reorganization when, in a 77B proceeding, petitioner's predecessor transferred to it its only asset, a building called the Claridge Apartments, in exchange for the issuance to the predecessor's creditors of 90 percent, and to its stockholders of 10 percent of petitioner's stock.

Whatever doubt there may have been that creditors of an insolvent predecessor corporation can furnish the continuity of proprietary interest necessary to a technical reorganization has recently been dispelled. *Helvering* v. *Alabama Asphaltic Limestone Co.*, 315 U. S. 179; *Palm Springs Holding Corporation* v. *Commissioner*, 315 U. S. 185. Nor are we by any means satisfied of the correctness of respondent's assertion that *Helvering* v. *Southwest Consolidated Corporation*, 315 U. S. 194, determines the present issue in his favor. It is true that that case emphasizes the requirement of the 1934 Act that to constitute a reorganization the transfer of property must be solely in exchange for the transferee's voting stock, and holds that even an indirect payment partly in cash defeats the attempt to apply it.

But effect is given, of course, to the retroactive amendment of 1939 removing from consideration the assumption of a transferor's indebtedness or acceptance of property subject to it; and the Court is at pains to point out that the transferee in the Southwest Consolidated case did more than this when it undertook under the plan to repay cash which had been borrowed to satisfy nonassenting creditors. "But in substance," it remarks, "the transaction was precisely the same as if respondent [the taxpayer] had paid cash

---

[1] *Helvering* v. *Alabama Asphaltic Limestone Co.*, 315 U. S. 179; *Palm Springs Holding Corporation* v. *Commissioner*, 315 U. S. 185; *Bondholders Committee, Marlborough Investment Co.* v. *Commissioner*, 315 U. S. 189; *Helvering* v. *Southwest Consolidated Corporation*, 315 U. S. 194.

plus voting stock for the properties. * * * part of the consideration which respondent paid for the properties of its predecessor was cash in the amount of about $106,680. The fact that it was paid to the bank rather than to the old corporation or its creditors is immaterial. The requirement to pay cash arose out of the reorganization itself. It derived, as did the requirement to pay stock, from the plan pursuant to which the properties were acquired. * * *"

Here the only payments of cash contemplated by the plan were for past-due taxes on the property, expenses of an abortive foreclosure action previously instituted against it, and costs and disbursements of the 77B proceeding itself. Respondent's brief concedes that "the delinquent realty taxes, fees paid to the counsel for the debtor corporation, and possibly fees paid in connection with foreclosure proceedings brought by the indenture trustee, * * * quite possibly (had petitioner offered and introduced the proof relating thereto) might have been shown to represent liabilities of the old debtor company."

We can not conceive that the only remaining item, the expense connected with the reorganization itself, including fees and disbursements to the bondholders' committee and its depositary, court costs, and payments for printing and for the organization of petitioner can be of the character to which the Supreme Court referred when it excluded items of which the "nature and amount were determined and fixed in the reorganization." Such payments did not, like those in the *Southwest Consolidated* case, go indirectly to the old corporation or its creditors. True, in a general sense they constituted part of the cost paid by petitioner for the property received. But they were of a nature characteristic of all reorganizations of this kind, and normally there is no source of payment for them save the new corporation or its property. If they are fatal here, then it is difficult to envision any plan growing out of an equity or 77B receivership which would qualify under section 112. We can not believe such a result was intended.

But, however that may be, we think petitioner has shown enough here to sustain its contention that nothing was paid except liabilities of the predecessor or its property. In Illinois real estate taxes are imposed, if not on the owner, at least on the land and building—*Edward C. Kohlsaat*, 40 B. T. A. 528, 535; *Pyramid Metals Co.*, 44 B. T. A. 1087, 1088—upon which they constitute a lien. These amounted to $13,000. The foreclosure proceedings likewise set up a liability for costs and expenses to which any conveyance of the property would presumably be subject. *Benton State Bank* v. *Bennett*, 249 Ill. App. 539; *Christensen* v. *Niebert*, 259 Ill. App. 96; *Chicago Trust Co.* v. *12–14 West Washington St. Building Corporation*, 278 Ill. App. 117. These amounted to $5,270.98. In addition,

the cash in the hands of the trustee for the old company was committed to payment of expenses to its full extent, namely $8,000.

There was thus a total of $26,270.98 which must be regarded either as indebtedness of the transferor assumed by the transferee or as a charge against the transferred property within the express terms of the 1939 amendment. The small balance of $229.02 is not only negligible under the circumstances, but we may take notice that it could reasonably have covered only such items as cost of petitioner's incorporation, stamp taxes, printing bills and the like, which were clearly no part of any payment by the transferee to the transferor "in exchange" for the transfer of the property. In the premises we are unwilling to say that petitioner has failed to sustain its burden of showing the necessary facts to invoke the provisions of section 112.

Respondent suggests that this fell short of a tax-free reorganization for the additional reason that, while the creditors received 90 percent of petitioner's stock, indicating that they had acquired effective ownership of the predecessor, the stockholders were given a 10 percent interest, which demonstrated that the creditors had not succeeded to an exclusive interest. It is urged, which is the fact, that no such situation existed in the cases recently decided by the Supreme Court.

We think, however, that this is a distinction without a difference. In the first place, if it were possible to imagine a set of circumstances where a corporation was insolvent to the extent that a 90 percent proprietary interest had accrued to its creditors but 10 percent was left in its former stockholders, no reason is apparent why the statutory language would not apply to a plan which gave effect to that division of ownership. The preservation of proprietary interests would be respected quite as much there as in, say, *Helvering* v. *Southwest Consolidated Corporation*, *supra*. The bondholders here "acquired substantially the entire proprietary interest of the old stockholders."

But in any event, the insolvency of the transferor in the present case is inescapable. There can be no question but that in fact and in law the creditors were in exclusive control. If the plan was improper and subject to disapproval upon the bondholders' objection, see *Northern Pacific Railway Co.* v. *Boyd*, 228 U. S. 482, that would not make it any the less a plan of reorganization upon acceptance by the necessary percentage of bondholders and confirmation by the court, although it might fail to qualify as an "exchange" under 112 (b) (5). See *Helvering* v. *Cement Investors, Inc.*, 316 U. S. 517. What reason there may have been for the voluntary recognition of the old stockholders to the extent of a nominal share in the new enterprise does not appear. It may well have been a desire not to be ungenerous, or, more likely, a selfish hope that their

pecuniary interest would encourage the former shareholders to more effective efforts under the management agreement. Certainly we need not view it as a concession that they retained any equity when the facts deny that possibility. It follows that, as far as the reorganization question goes, petitioner was entitled to the original basis.

Apart from this, however, respondent insists that the provisions of the so-called "Chandler Act," [2] particularly section 270, as amended, require that petitioner's basis be reduced to the fair market value of the property when petitioner received it, but he concedes that under *The Commodore, Inc.*, 46 B. T. A. 718, no year earlier than 1938 would be affected.

---

[2] Public No. 696, 75th Cong., 52 Stat. 840, as amended:

"Sec. 268. Except as provided in section 270 of this Act, no income or profit, taxable under any law of the United States or of any State now in force or which may hereafter be enacted, shall, in respect to the adjustment of the indebtedness of a debtor in a proceeding under this chapter, be deemed to have accrued to or to have been realized by a debtor, by a trustee provided for in a plan under this chapter, or by a corporation organized or made use of for effectuating a plan under this chapter by reason of a modification in or cancelation in whole or in part of any of the indebtedness of the debtor in a proceeding under this chapter.

"Sec. 269. Where it appears that a plan has for one of its principal purposes the avoidance of taxes, objection to its confirmation may be made on that ground by the Secretary of the Treasury, or, in the case of a State, by the corresponding official or other person so authorized. Such objections shall be heard and determined by the judge, independently of other objections which may be made to the confirmation of the plan, and, if the judge shall be satisfied that such purpose exists, he shall refuse to confirm the plan.

"Sec. 270. In determining the basis of property for any purposes of any law of the United States or of a State imposing a tax upon income, the basis of the debtor's property (other than money) or of such property (other than money) as is transferred to any person required to use the debtor's basis in whole or in part shall be decreased by an amount equal to the amount by which the indebtedness of the debtor, not including accrued interest unpaid and not resulting in a tax benefit on any income tax return, has been canceled or reduced in a proceeding under this chapter, but the basis of any particular property shall not be decreased to an amount less than the fair market value of such property as of the date of entry of the order confirming the plan. Any determination of value in a proceeding under this chapter shall not be deemed a determination of fair market value for the purposes of this section. The Commissioner of Internal Revenue, with the approval of the Secretary of the Treasury, shall prescribe such regulations as he may deem necessary in order to reflect such decrease in basis for Federal income-tax purposes and otherwise carry into effect the purposes of this section.

\*      \*      \*      \*      \*      \*      \*

"Sec. 276. c. the provisions of sections 77A and 77B of chapter VIII, as amended, of the Act entitled 'An Act to establish a uniform system of bankruptcy throughout the United States', approved July 1, 1898, shall continue in full force and effect with respect to proceedings pending under those sections upon the effective date of this amendatory Act, except that—

(1) if the petition in such proceedings was approved within three months prior to the effective date of this amendatory Act, the provisions of this chapter shall apply in their entirety to such proceedings; and

(2) if the petition in such proceedings was approved more than three months before the effective date of this amendatory Act, the provisions of this chapter shall apply to such proceedings to the extent that the judge shall deem their application practicable; and

(3) sections 268 and 270 of this Act shall apply to any plan confirmed under section 77B before the effective date of this amendatory Act and to any plan which may be confirmed under section 77B on and after such effective date, except that the exemption provided by section 268 of this Act may be disallowed if it shall be made to appear that any such plan had for one of its principal purposes the avoidance of income taxes, and except further that where such plan has not been confirmed on and after such effective date, section 269 of this Act shall apply where practicable and expedient."

That the provision does apply to the petitioner's 1938 tax liability, however, seems to us not subject to serious doubt. The act was made effective September 22, 1938, before the end of the petitioner's 1938 tax year, and long before its return for that year became due. The reasons advanced in *The Commodore, Inc.*, *supra*, including reference to the legislative history, are hence inappropriate. The "future" liability to which the Committee referred was evidently an apt description of the present situation, since the end of the year as of which the tax was to be computed and the date when the first installment would become due both lay ahead when the act became effective.

While not strictly a revenue act, the legislation by its terms dealt with taxes, and can be assumed to have envisaged like principles as to periods to which it would apply. It is now so familiar as to be virtually traditional that revenue acts cover calendar years during which they take effect. See *United States* v. *Hudson*, 299 U. S. 498. In fact, it possibly requires express language to avoid application even to earlier periods. Cf., e.g., Revenue Act of 1938, secs. 1 and 903. And our system of administering income tax computation on an annual basis makes impractical such suggestions as petitioner's that if relevant at all the Chandler Act should be construed to fix depreciation only for the part of the year remaining after it went into effect.

The question remains, however, whether in this case the "indebtedness * * * has been canceled or reduced" as described in section 270. Section 268 is an obvious legislative effort to release 77B reorganizations from the tax burden of the *Kirby* case,[3] and, since section 270 is manifestly in *pari materia* with it, we have to consider whether this is the sort of situation to which either section was intended to apply. It may advance us little to grant that in the meantime some courts have devised a formula for lifting certain types of debt adjustment out of the *Kirby* rule. E.g., *Hirsch* v. *Commissioner* (C. C. A., 7th Cir.), 115 Fed. (2d) 656. But cf. *Frank* v. *United States* (U. S. Dist. Ct., E. Dist. Pa.), 44 Fed. Supp. 729. For the theory of that limited group of cases is that the property for the purchase of which the debt was incurred has so declined in value that the cancellation may be regarded as no more than a retrospective readjustment of the original purchase price. That being so, there is no reason to grant the owner a deduction for depreciation computed on a larger base, any more than to permit him to report his ultimate gain or loss on disposition by using the original higher cost. See *Hirsch* v. *Commissioner*, *supra*.

But in another setting, the same result has been reached on a totally different theory. The substitution of common stock for bonds

---

[3] *Kirby Lumber Co.* v. *United States*, 284 U. S. 1.

is not a cancellation or reduction of the liability represented by the bonds, no matter how much less the stock may be worth, since "the assets are not thereby freed from obligation. * * * While the bond loan has been terminated, the amount borrowed is now committed to capital stock liability instead of to the liability of a fixed indebtedness." *Capento Securities Corporation,* 47 B. T. A. 691.

Using this approach, it is evident that there was here no true reduction or cancellation of the original indebtedness, but what amounts to a continuation of it in another form. It follows that neither the language nor the reason for section 270 has any application here. Both gain or loss and depreciation to the new corporation can appropriately be measured by the old basis, without doing violence either to the tax consequences of the reorganization or to the doctrines upon which those consequences rest.

What we have said, however, relates only to the outstanding principal of the bonded debt. The interest was also due, and that it was forgiven rather than transformed into stock appears affirmatively, although its amount is not shown. Adjustment for this item must be made. *Capento Securities Corporation, supra.* True, the statute excludes "accrued interest unpaid" from the write-down of basis on account of forgiveness, but only if "not resulting in a tax benefit on any income tax return." We can not say from the evidence what the facts are in this respect, and accordingly must assume, in respondent's favor, that petitioner's predecessor had obtained a tax benefit as to the entire amount. What that amount should be can, it is to be hoped, be agreed upon by the parties in connection with the computation under Rule 50.

We are not concerned by fears for the constitutionality of such an interpretation in so far as it involves a retroactive application to reorganizations previously completed, like the one before us. The legislative intention to deal with such cases must be accepted. *The Commodore, Inc., supra.* Only the tax liability for the year of enactment is in question. See *United States* v. *Hudson, supra.* A new basis growing out of a previously completed reorganization may constitutionally be provided. *Schweitzer & Conrad, Inc.,* 41 B. T. A. 533. And in any event, the doctrine of the *Hendler* case[4] prevented this from being a tax-free reorganization at the time it took place. See *Helvering* v. *Southwest Consolidated Corporation, supra.* The proper depreciation basis then became petitioner's cost. Only the retroactive amendment of 1939 eliminated the *Hendler* principle an' in the meantime the Chandler Act had been enacted. There was nce no hiatus in petitioner's continuing liability, and the provisic.; if it can be said to be

---

[4] *United States* v. *Hendler,* 303 U. S. 564.

retroactive at all, certainly made no change in petitioner's position and hence obviously had no unconstitutional effect upon its substantial rights.

This conclusion requires that we find both the predecessor's basis, for the years 1935 [5] through 1937, and the fair market value on confirmation for 1938. The latter is necessary in the event that adjustment for the forgiven interest would otherwise reduce the adjusted basis below that amount. The required figures have been included in our findings of fact. Although petitioner and its predecessor consistently used a higher basis, we have found the one determined by the Commissioner, since the petitioner's witness failed to convince us that any amount was actually paid by the old company for contractor's services, or that the original stock issue in fact covered any more than the land.

In ascertaining fair market value upon confirmation we have given consideration to the highest figure estimated by respondent's expert for the property as a whole, bearing in mind the actual sale in 1940, and the value placed upon the land alone by petitioner's witness, as being most conducive to a computation which is reasonably fair under all the circumstances. This market value may constitute petitioner's basis for 1938, if it develops that it is higher than the original basis reduced by the part of the debt adjustment ratably allocated to the depreciable property in the proportion of original land value to total basis. See Regulations 94, art. 113(b)–2, as amended (1940–2 C. B. 107).

There remains the question of petitioner's claim for deductions of decorating and repair items as business expense for 1937. While the parties are in accord that petitioner's books and tax returns were figured on the "accrual" basis, the explanation given rather resembles a cash or reverse accrual system. The deductions in question were customarily taken in the year payment was made, but they were set up as a sort of reserve running into the following year, not because payment was not due, but apparently on the theory that leases to which they were applicable would return income during that period.

For tax purposes, however, there seems little question that items deducted in one year can not properly be duplicated in the next, and that, whatever the system of accounting, it can not be authorized if it calls for that treatment. Since we are satisfied from the evidence that petitioner is seeking for 1937 a deduction already taken and allowed for the prior year, respondent's disallowance is approved.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

[5] Petitioner conceded at the hearing that as owner for only the last five months of 1935 it was entitled to only that proportion of the year's depreciation.

SMITH, *J.*, concurring: I agree that the basis for depreciation of petitioner's assets for 1938 is the fair market value of the assets at the date of reorganization. It is stated, however, in the Court's opinion that:

* * * The substitution of common stock for bonds is not a cancellation or reduction of the liability represented by the bonds, no matter how much less the stock may be worth, since "the assets are not thereby freed from obligation. * * * While the bond loan has been terminated, the amount borrowed is now committed to capital stock liability instead of to the liability of a fixed indebtedness." *Capento Securities Corporation,* 47 **B. T. A.** 691

I think that this observation is contrary to well recognized principles of law. Where a corporation substitutes shares of stock in exchange for bonds the corporation is freed from indebtedness. A corporation does not owe any debt in respect of its capital stock.