THE SOUTHLAND ICE COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 5705. Promulgated September 28, 1945.

*Webster Atwell, Esq.*, and *Elijah Crippen, Esq.*, for the petitioner. *J. Marvin Kelly, Esq.*, for the respondent.

OPINION.

OPPER, *Judge*: The deficiencies here contested are in income, excess profits, and declared value excess profits taxes for the calendar years 1935 to 1941, inclusive, aggregating $90,904.80, as follows:

| Year | Deficiency | | |
| --- | --- | --- | --- |
| | Income tax | Excess profits tax | Declared value excess profits tax |
| 1935 | $8,542.83 | | |
| 1936 | 8,450.36 | $3,877.14 | |
| 1937 | 9,720.62 | 1,934.60 | |
| 1938 | 8,925.27 | 5,177.47 | |
| 1939 | 10,971.00 | | $1,870.37 |
| 1940 | 13,532.80 | | |
| 1941 | 15,645.24 | | 2,257.10 |
| Total | 75,788.12 | 10,989.21 | 4,127.47 |

Petitioner claims an overpayment of $82,848.28.

The single question common to all years is the proper basis for gain or loss and depreciation of property acquired by petitioner as the result of an equity receivership of an insolvent predecessor.

The facts have been stipulated and are hereby found accordingly.

Petitioner is a Delaware corporation, having its principal office in Dallas, Texas. It was chartered December 10, 1934, and on December 15, 1934, the first meeting of the board of directors was held. It commenced operations January 1, 1935. Returns for the calendar years involved in this proceeding were filed with the collector of internal revenue for the second district of Texas, Dallas, Texas.

The Southland Ice Co., petitioner's predecessor corporation (hereinafter referred to as the "old company"), was a Texas corporation. In December 1932 it had outstanding $1,363,900 of 6 percent first mortgage bonds, secured by a deed of trust dated July 1, 1927, creating a first lien covering all of its properties, rents, and revenues. It also owed $200,000 in unsecured indebtedness. It had outstanding 10,250 shares of 7 percent preferred stock upon which there were cumulative preferred dividends due and unpaid in an amount in excess of $50,000.

On December 17, 1932, suit was filed by a bondholder for herself and all others similarly situated in the United States District Court for the Northern District of Texas, at Dallas, seeking protection of their security and asking the appointment of a receiver and foreclosure of the lien securing the bonds. The suit was captioned "Pearl B. Zellers v. Southland Ice Company, in Equity No. 3408–663." On December 19, 1932, Joe C. Thompson, president of the old company, and president of petitioner, was appointed receiver and acted as operating receiver of all the properties until the formation of the petitioner, which acquired

all of the properties and assets of the old company. The old company was insolvent.

A bondholders' committee (hereinafter referred to as the committee) negotiated a deposit agreement on May 9, 1933, in which the First National Bank of Dallas was designated as depositary. It provided, *inter alia:*

The Committee shall have power, either before or after any sale of the Trust Property or acquisition thereof by the Trustee or the Committee on foreclosure or otherwise, to make, enter into, or become a party to (either alone or in conjunction with other bondholders, creditors, stockholders, or committees representing them, or otherwise), a plan or agreement of reorganization or readjustment of the property and/or affairs of the Mortgagor containing such terms and conditions as the Committee may, in its sole discretion, deem proper or advisable, or the Committee may approve and adopt any such plan or agreement though not prepared by it. * * *

Such plan or agreement of reorganization or readjustment may be effected (but need not be) by a merger or consolidation of the Mortgagor with any other corporation or corporations, trust or trusts, or may be effected by a sale and/or the transfer of the Trust property or other property of the Mortgagor to any person or persons, corporation or corporations, trust or trusts, or by an exchange of the deposited bonds and/or coupons for other bonds, securities and/or stocks.

On February 1, 1934, the committee adopted a plan of reorganization of the old company, "conditioned upon the acquisition of the property by the Committee or its nominee at the forthcoming foreclosure sale and upon approval of the plan by the United States District Court." As so conditioned the plan provided that:

(1) A new corporation would be formed to take over the properties and assets of the old company. It would have an authorized capital stock consisting of 13,644 shares of no par common stock.

(2) Title to the property of the old company would be conveyed to the new corporation.

(3) In lieu of the interest coupons past due upon the first mortgage bonds of the old company, one share of common stock of the new company would be issued to the owner and holder of each $100 par value of bonds deposited.

(4) The new company would be authorized to issue 15-year 6 percent income sinking fund bonds (income bonds) in an amount equal to 50 percent of the bonds deposited with the depositary, the new bonds to be secured by trust indenture covering all of the property acquired by the new company, which was to be a first lien on such property and the rents, profits, and revenues derived therefrom.

(5) Upon the consummation of the reorganization each depositing first mortgage bondholder would receive a new income bond in a face amount equal to 50 percent of the face value of the bonds deposited by him, together with one share of common stock for each $100 par value of bonds so deposited. No other common stock would

be issued; no preferred stock at all would be issued, nor would the charter of the new company provide for any.

(6) The plan contemplated that the funds accumulated by the receiver would be "more than sufficient to pay all expenses and leave a working capital for the new company." Such funds would be disbursed, among other things, for "cash payments required to be made by the committee in payment to nondepositing bondholders based upon the foreclosure price."

On June 11, 1934, First National Bank of Chicago and Roy C. Osgood, as trustees under deed of trust of the old company, were allowed to and did intervene in the suit, asking for judgment upon the old bonds and for foreclosure of the lien. And on the same date the committee was allowed to and also did intervene. On June 12, 1934, judgment in the sum of $1,533,353.48 (representing the amount of the bonds and interest due thereon), plus 6 percent interest from its date was entered, together with a decree of foreclosure of the lien securing these bonds.

Pursuant to notice, the foreclosure sale was held on August 6, 1934, and the properties were bid in by the committee for the sum of $272,-780. On September 15, 1934, the order of sale was confirmed and the plan of reorganization was approved, and all of the properties and assets of the old company were ordered transferred to the committee or its nominee in accordance with the provisions of the plan.

All of the properties and assets which the court ordered sold and conveyed constituted all of the petitioner's properties and assets, with respect to which it has used the basis of its predecessor corporation for depreciation and disposal purposes in its returns for the years in controversy.

On September 15, 1934, a deficiency judgment was entered against the old company in the sum of $1,274,407.63, with 6 percent interest thereon from its date.

The court found that there was available for distribution at that time the sum of $150,000, which was accumulated by the receiver from rents, revenues, and profits of the mortgaged properties, and ordered distribution thereof by the receiver as follows: 91.1797 percent to the committee, this being the percentage of bonds then deposited with it; 8.8203 percent to First National Bank of Chicago and Roy C. Osgood, intervening trustees, on behalf of the nondepositors.

Subsequent thereto additional bonds were deposited, bringing the total to 93.85585 percent of those outstanding, and on December 28, 1934, an order was entered requiring the trustees to repay to the receiver the sum of $1,750.38, which represented an overpayment in the distribution to the trustees for the benefit and use of the nondepositing bondholders, and requiring the special commissioner to pay to peti-

tioner the sum of $5,100, since that amount was in excess of the amount due the nondepositing bondholders.

The final amounts remitted to the trustees of the nondepositing bondholders were $11,480.07 paid them by the receiver under order of court and $16,760 paid them by the committee through the special commissioner as their pro rata part of the foreclosure sale.

On December 28, 1934, petitioner intervened in the equity proceedings, the court finding that petitioner was organized pursuant to the plan of reorganization and was the assignee of the nominee of the committee, and that there had been conveyed to it all of the mortgaged properties of the old company. The court order provided:

That the securities be issued by the intervenor, The Southland Ice Company [petitioner], to-wit, $640,050.00 First Mortgage Fifteen Year Income Bonds and 12,801 fully paid non-assessable shares without par value of its capital stock for a stated consideration of $10.00 per share and issued in exchange for bona fide outstanding securities and in accordance with the plan of reorganization, which plan of reorganization after due hearing and after all persons have had a right to appear has been found by this Court to be fair and has been approved in all respects in accordance with the Federal Securities Act of 1933 and the amendments thereto. That the intervenor, The Southland Ice Company, be and is hereby ordered to issue and deliver such securities to those persons, firms and corporations as certified to it by The First National Bank in Dallas.

The stock was issued, as were the bonds in an amount of $640,050, there having been deposited $1,280,100 in old bonds. The new income bonds were issued on the basis of $50 for each $100 par value of old bonds deposited. The foregoing stock and bonds were issued in exact accordance with the provisions of the plan of reorganization.

By conveyances made by the old company and by the special commissioner, petitioner received all of the properties and assets of the old company, under orders of the District Court, and petitioner has been owner of said properties and assets since December 31, 1934.

For calendar years involved in this suit petitioner has made its returns as adjusted, using the basis of the old company for depreciation and disposal purposes as to all those properties and assets acquired by petitioner from the old company. This base was $2,358,088.40 for the depreciable properties (less reserve of $815,480.70) and $412,229.08 for the real estate.

The depositing bondholders of the old company were issued the voting stock and the income bonds of petitioner in proportion to their interest in the properties and assets of the old company prior to the exchange.

The first year's interest on the new income bonds which were issued as of the date thereof of January 1, 1934, in the amount of $38,403, was withheld by the committee and paid ultimately to the holders of the new bonds.

Petitioner issued its income bonds in the amount of 50 percent of par value of the old bonds in order to assume that amount of the bonded indebtedness of the old company and in substitution thereof.

In the year 1943 petitioner executed "Waiver of Restrictions on Assessment and Collection of Deficiency in Tax" and received from respondent a deficiency assessment notice in the amount of $82,848.28 for the same calendar years involved in the notice of deficiency. Such additional tax was based upon the refusal of the internal revenue agent in charge to allow petitioner's claimed depreciation and loss on disposal of assets calculated upon the basis of the cost of those properties and assets to the predecessor company and upon his setting a lower figure than such basis as the fair market value of such properties and assets at the time they were acquired by petitioner. On May 3, 1943, petitioner paid the collector of internal revenue at Dallas, Texas, $99,014.91, which represented the deficiency assessment of $82,848.28, plus interest in the sum of $16,166.63. Thereafter, on June 14, 1944, respondent mailed to petitioner the notice of deficiency and calculated petitioner's tax liability for the years involved upon the basis of the foreclosure sale price being the fair market value of the properties and assets acquired, and disallowed petitioner's claimed depreciation and loss on the disposal of assets calculated upon the basis of the cost of those properties and assets to the predecessor company. This petition was filed in the Tax Court of the United States on August 5, 1944, which is within two years of the time the above payment was made.

"This case," in the words of respondent's brief, "presents, broadly, the problem of the tax consequences of corporate readjustments in which creditors [the bondholders] of the old company become the stockholders of the new corporation which succeeds to the business of the old. The immediate issue is whether the petitioner [the new company] is entitled to use the basis which the properties had in the hands of the old company   *   *   *."

As the transaction eventuated, nearly 94 percent of the old bondholders participated in the plan which, by means of an equity receivership, accomplished the transfer of the old company's business to a new corporation, of which those bondholders, in addition to receiving new income bonds, became the sole shareholders. The 6 odd percent of nonassenting bondholders were paid in cash by the receiver an amount which represented the corresponding portion of the bid price for the properties; but the cash itself was actually available out of operating income accumulated during the receivership and prior to the creation of the petitioner, the new corporation; so that in fact it constituted a part of the assets belonging to the old corporation, or to its owner-creditors as a group. It was, accordingly, withheld from the property

transferred, and formed no part of what the new company acquired and for which its stock and bonds were issued.

It is not entirely clear whether respondent concedes that this was one of those "insolvency reorganizations" which "are within the family of financial readjustments embraced" in the terms of the reorganization provisions. *Helvering* v. *Alabama Asphaltic Limestone Co.*, 315 U. S. 179, 184. But we are convinced that unless some technical aspect of the definition of a reorganization precludes it, the transaction here should be included within that broad sweep. Cf. *Claridge Apartments Co.*, 1 T. C. 163; reversed on other grounds (C. C. A., 7th Cir.), 138 Fed. (2d) 962, and remanded, 323 U. S. 141. The statutory definition would offer no difficulty were it not for the difference in language between the 1934 and subsequent Acts,[1] applicable here, and those of 1928 and 1932 construed in the *Alabama Asphaltic* case and *Palm Springs Holding Corporation* v. *Commissioner*, 315 U. S. 185, which accompanied it.

Fundamentally, the question of interpreting the statutory language reduces to this: Does "solely for voting stock" mean that whatever property is acquired must be paid for by the transferee in its voting stock, and nothing else, or that only voting stock can be received by any of those entitled to participate? In the former case the present transaction would qualify, since the cash paid to the nonassenters was never transferred to the new company; in the latter, it would not. The problem is a difficult one, and the result by no means clear. But we think the solution is to be found in the remaining portion of the provision, which fails to require that all of the transferor's property be transferred and which is satisfied if "substantially all" is included.

This approach seems to us to find support in the language of *Helvering* v. *Southwest Consolidated Corporation*, 315 U. S. 194, that "the requirements of section 112 (g) (1) (B) are not met if properties are acquired in exchange for a consideration other than, or in addition to, voting stock." In that case "security holders of the old company owning $440,000 face amount of obligations were paid off in cash. That cash was raised during the reorganization on a loan from a bank. Since that loan was assumed by respondent [the new company], it is

---

[1] E. g., 1934 Act. sec. 112 (g) :

"(g) DEFINITION OF REORGANIZATION.—As used in this section and section 113—

"(1) The term 'reorganization' means (A) a statutory merger or consolidation, or (B) the acquisition by one corporation in exchange solely for all or a part of its voting stock: of at least 80 per centum of the voting stock and at least 80 per centum of the total number of shares of all other classes of stock of another corporation; or of substantially all the properties of another corporation, or (C) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor or its stockholders or both are in control of the corporation to which the assets are transferred, or (D) a recapitalization, or (E) a mere change in identity, form, or place of organization, however effected."

argued that the requirement of clause (B), as amended in 1939, was satisfied." [2] This contention was rejected, the court saying, "But in substance the transaction was precisely the same *as if respondent had paid cash* plus voting stock *for the properties* * * *. The fact that it was paid to the bank rather than to the old corporation or its creditors is immaterial * * *. Though the liability assumed had its origin in obligations of the transferor, its nature and amount were determined and fixed in the reorganization * * *." (Emphasis added.)

At the risk of repeating the obvious, we emphasize that in the *Southwest* case the effect of the 1939 amendment was a material inquiry. The taxpayer could not have succeeded without it. Here that amendment has no bearing on this phase of the problem. The petitioner does not claim that the cash payments were permissible under any "assumption of liability" theory, and, if we are right, its position in that respect would be as forceful without the 1939 amendment as with it. But much of the language in the *Southwest* case is occasioned by that amendment, and for that reason is to be read here with discrimination.

In considering whether the result reached in the *Southwest* case is applicable here, both the technical language and the underlying philosophy of the reorganization definitions must be taken into account. The Supreme Court in that case resorted not so much to the words employed in the statute as to the concept that the procedure there followed was but an indirect method of accomplishing what the statute was designed to forbid, namely, payment by the transferee to the transferor or its owners of cash as part consideration for the transfer. It seems logical that the Court recognized the danger that any such hypertechnical limitation of the statutory definition would open the gates wide to a virtual nullification of that fundamental requirement; for if the owners of the property could be paid off by borrowed cash and the debt be treated as an assumption of prior liabilities,[3] there appears no limit to the possibilities of "sales * * * cast into the form of a reorganization."

Our present inquiry should accordingly be directed to whether a comparable danger to the reorganization philosophy lurks in the procedure adopted here. We conclude that it does not. The requirement

[2] SEC. 112. * * *

(g) * * *

(1) The term "reorganization" means * * * the acquisition by one corporation, in exchange solely for all or a part of its voting stock, of substantially all the properties of another corporation, but in determining whether the exchange is solely for voting stock the assumption by the acquiring corporation of a liability of the other, or the fact that property acquired is subject to a liability, shall be disregarded * * *

[3] Under section 112, as amended by Revenue Act of 1939.

that "substantially all" of the transferor's property be included in the transfer seems to us a sufficient safeguard in cases of this type.

There is no apparent limitation on the amount a corporation might borrow in the security of its property; and if that property were then turned over to a new corporation in exchange for a part of its voting stock and an assumption of the ensuing liability, the claim could have been made, prior to *Southwest Consolidated*, that the definition had been complied with. But the preliminary withdrawal of a portion of the transferor corporation's property from the total to be transferred, even in the form of cash, and even with the purpose of paying nonassenters, is necessarily limited by the express requirement that what remains to be transferred include substantially all the transferor's properties.[4]

Hence, only in such a situation as this, where an inconsiderable minority interest[5] needs to be paid off in cash, and the corporate business and "substantially all" the corporation's property is continued in the control[6] of a correspondingly complete group of the transferor's owners, can there be found the requisite fulfillment of the statutory requirements. So limited, it is difficult to see the possibility that any can qualify save true reorganizations in the economic sense.

The consequence would seem to be that this was not, on the one hand, a transfer of properties "in exchange for a consideration other than, or in addition to, voting stock," within the *Southwest* principle, but that it was, on the other, the acquisition of substantially all, but not quite all, of a corporation's property solely in exchange for the transferee's voting stock, within the express terms of section 112 (g) (1) (B), even though the small fraction of the property not so transferred was used in its entirety to pay off in cash the dissenting property owners.

In our discussion we have treated the consideration as consisting solely of voting stock. In fact, of course, there was in addition the issuance of new income bonds to the old bondholders who participated. We disregard this item as embraced within the excepting language of the 1939 amendment. *Louis E. Stoddard, Jr.*, 47 B. T. A. 584; reversed, other issue (C. C. A., 2d Cir.), 141 Fed. (2d) 76; see *Harden F. Taylor*, 43 B. T. A. 563; affd. (C. C. A., 2d Cir.), 128 Fed. (2d) 885; *New Jersey Mortgage & Title Co.*, 3 T. C. 1277.

Since, as we conclude, petitioner's properties were acquired by it "in connection with a reorganization," section 113 (a) (7) entitles it to

---

[4] Even this provision has been subjected to construction which in effect applies a continuity test rather than mere blind percentages. *Milton Smith*, 34 B. T. A. 702; cf. G. C. M. 1345, VI-1 C. B. 15.

[5] *Benjamin R. Britt*, 40 B. T. A. 790; affd. (C. C. A., 4th Cir.), 114 Fed. (2d) 10; *Commissioner* v. *First National Bank of Altoona* (C. C. A., 3d Cir.), 104 Fed. (2d) 865.

[6] See section 113 (a) (7) (A), footnote 7, *infra*, and cf. section 112 (h).

the basis of its transferor.[7] If the nonassenting bondholders sustained losses which could be recognized, they were still not the transferors for purposes of that section, and no adjustment of the basis on that account is required. *Muskegon Motor Specialties Co.*, 45 B. T. A. 551; affd. (C. C. A., 6th Cir.), 134 Fed. (2d) 904; certiorari denied, 320 U. S. 741. It was the old corporation which was the transferor, the bondholders and their committee acting as a mere conduit. *Helvering v. Alabama Asphaltic Limestone Co., supra; Palm Springs Holding Corporation v. Commissioner, supra; Mark Kleedon*, 38 B. T. A. 821. Any gain or loss which it sustained was not recognizable. Revenue Act of 1934, sec. 112 (b) (4) and (d) (1). The basis of petitioner's transferor made available to it by section 113 (a) (7) accordingly requires no adjustment for gain or loss recognized under the law applicable to the transfer.

It is unnecessary to consider petitioner's further contention that, if no reorganization occurred, there was an exchange under 112 (b) (5), entitling petitioner to the benefits of section 113 (a) (8). We may emphasize, however, that we intimate no opinion that petitioner, the transferee, could succeed in its attempt, as distinguished from the participating individuals. Cf. *Helvering v. Cement Investors, Inc.*, 316 U. S. 527.

*Decision will be entered under Rule 50.*

---

[7] SEC. 113. ADJUSTED BASIS FOR DETERMINING GAIN OR LOSS.

(a) BASIS (UNADJUSTED) OF PROPERTY.—The basis of property shall be the cost of such property ; except that—

\*    \*    \*    \*    \*    \*    \*

(7) TRANSFERS TO CORPORATION.—If the property was acquired—(A) after December 31, 1917, and in a taxable year beginning before January 1, 1936, by a corporation in connection with a reorganization, and immediately after the transfer an interest or control in such property of 50 per centum or more remained in the same persons or any of them, or (B) in a taxable year beginning after December 31, 1935, by a corporation in connection with a reorganization, then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain or decreased in the amount of loss recognized to the transferor upon such transfer under the law applicable to the year in which the transfer was made. This paragraph shall not apply if the property acquired consists of stock or securities in a corporation a party to the reorganization, unless acquired by the issuance of stock or securities of the transferee as the consideration in whole or in part for the transfer.